[18 NE3d 379, 993 NYS2d 668]

The People of the State of New York, Respondent, v John F. Haggerty, Jr., Appellant, et al., Defendant.

Argued June 3, 2014; decided June 30, 2014

**POINTS OF COUNSEL**

*Zuckerman Spaeder LLP*, New York City (*Paul Shechtman* of counsel), for appellant. The testimony about the terms of the Bloomberg Trust violated the best evidence rule. (*Schozer v William Penn Life Ins. Co. of N.Y.*, 84 NY2d 639; *Davis v Alaska*, 415 US 308; *Kearney v Mayor of City of N.Y.*, 92 NY 617; *People v Hamilton*, 304 AD2d 500; *United States v Holley*, 463 F2d 634; *United States v Lee*, 106 US 196; *United States v Nixon*, 418 US 683.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Vincent Rivellese* and *Hilary Hassler* of counsel), for respondent. Testimony by a lawyer who drafted the Bloomberg Revocable Trust that the Mayor owned the money in the trust did not violate the best evidence rule. In any event, the testimony was

harmless, because the Mayor's ownership of the money was overwhelmingly proved. (*Schozer v William Penn Life Ins. Co. of N.Y.*, 84 NY2d 639; *People v Joseph*, 86 NY2d 565; *Trombley v Seligman*, 191 NY 400; *People v Dicks*, 100 AD3d 528; *Billingy v Blagrove*, 84 AD3d 848; *People v Hamilton*, 304 AD2d 500; *Chamberlain v Amato*, 259 AD2d 1048; *Matter of La Rue v Crandall*, 254 AD2d 633; *People v Alvino*, 71 NY2d 233; *People v Rosario*, 9 NY2d 286.)

### OPINION OF THE COURT

RIVERA, J.

A jury convicted defendant John Haggerty of grand larceny and money laundering after hearing evidence that he defrauded former New York City Mayor Michael R. Bloomberg of $750,000. Defendant challenges his conviction on the basis that testimony regarding the source of the stolen funds violated the best evidence rule. We conclude that defendant's challenge lacks merit. Accordingly, the order of the Appellate Division should be affirmed.

I

In 2009, then-Mayor Michael R. Bloomberg was running for reelection and sought to fund what he called a ballot security operation for the purpose of protecting voter access to the polls. Defendant was a Bloomberg campaign volunteer who had assisted with ballot security during Bloomberg's 2005 mayoral campaign. Defendant offered to organize ballot security for the 2009 elections and earned the trust of Bloomberg's campaign staffers. Unbeknownst to them, defendant's proposed ballot security operation was, in reality, a scheme to defraud Bloomberg of his money.

After several discussions with high-level campaign staff members, defendant submitted his budget, which described the proposed ballot security measures. His plan included hiring more than a thousand people for an elaborate citywide operation. The budget estimated the cost of the operation at $1.1 million. In late October, the campaign treasurer authorized the transfer of $1.2 million, in two $600,000 installments, from the Michael R. Bloomberg Revocable Trust to the Independence Party, which was Bloomberg's political party at the time. Of this transfer, $1.1 million was slated to fund the ballot security operation, and $100,000 was a campaign contribution to the Independence Party. According to Bloomberg, the ballot security

operation was meant to benefit all of the Party's candidates, and, thus, the Party had direct oversight of the operation. As the representative of the Bloomberg campaign, defendant arranged with the Independence Party to provide ballot security services in accordance with his proposed budget.

On election day, defendant provided minimal coverage of the polls at a fraction of the costs he had budgeted. Instead of hiring thousands of people, defendant relied on a small staff of volunteers. Total costs amounted to approximately $32,000. Nonetheless, in conversations with Bloomberg campaign staffers, defendant maintained that he had made significant expenditures on ballot security.

As it turned out, defendant billed for fictitious ballot security services in order to buy his brother's share of their childhood home in Queens, which they had jointly inherited. To effectuate his scheme, defendant incorporated codefendant Special Election Operations (SEO), naming himself as sole member, and providing the Albany address of a friend as its place of business. He also opened an account at a Queens bank in SEO's name, listing himself as the sole signatory. Subsequently, SEO billed and received $750,000 from the Independence Party for the ballot security operation. Defendant withdrew the money from the SEO account and used it to buy the house in Queens.

In January 2010, the Independence Party filed its mandatory financial disclosure with the State Board of Elections, and a reporter asked Bloomberg's lawyer for information regarding the ballot security operation. Bloomberg's lawyer contacted defendant and requested documents to account for ballot security expenses, and defendant agreed to supply pay stubs for payments made to poll watchers. Defendant then wrote separate $500 checks to three people who had volunteered as poll watchers and forwarded the check stubs to Bloomberg's agents.

This documentation raised suspicions with the reporter and Bloomberg's staff. Eventually, the New York County District Attorney began an investigation that led to defendant's indictment and prosecution for grand larceny in the first degree (Penal Law § 155.42) for stealing over $1 million from Bloomberg, money laundering in the second degree (Penal Law § 470.15 [1] [b] [ii] [A]; [iii]) for hiding the money, and falsifying business records in the first degree (Penal Law § 175.10) for drawing the phony checks.

## II

At trial, Bloomberg testified that he funded a $1.1 million ballot security operation based on representations defendant made to his staff, and that his staff transferred his personal money to the Independence Party to accomplish this plan. He further testified that his campaign never received satisfactory documentation supporting the expenditures. On cross-examination, Bloomberg admitted a lack of personal knowledge concerning the specifics of the fund transfers and the details of the proposed ballot security project.

To discuss these specifics, the People presented evidence from members of Bloomberg's campaign staff and the Independence Party. These staff members testified that they had released $1.1 million of Bloomberg's money in two installments to the Independence Party for use in the ballot security operation. The staff members also testified that the amount transferred corresponded to defendant's phony budget projections. An official from the Independence Party testified that the Party paid approximately $750,000 of this money to defendant or to SEO in exchange for ballot security services that were never rendered.

The People's financial investigator testified that defendant paid for his house in Queens with funds that originated with the Independence Party. The investigator testified that the Independence Party received the funds through two wire transfers from the Michael R. Bloomberg Revocable Trust. Documents supporting these allegations were admitted into evidence. On cross-examination, the investigator admitted that he did not know the terms of the trust, the name of the trustee, or the name of the beneficiaries. Defense counsel raised the possibility that the purloined funds were not property belonging to Michael Bloomberg, but, rather, property belonging to the trust, a separate legal entity.

During a sidebar, the People requested that the defense stipulate to Bloomberg's ownership of the funds, but the defense refused to do so. In response, the People called Marjorie Jane Friday, the principal draftsperson of the trust. Over defendant's objection that the best evidence rule required the People to introduce the trust instrument itself, she testified that the trust funds belonged to Michael Bloomberg.

The jury found defendant guilty of grand larceny and money laundering, both in the second degree. The Appellate Division affirmed (*People v Haggerty*, 103 AD3d 438 [1st Dept 2013]). A

Judge of this Court granted defendant leave to appeal (21 NY3d 1015 [2013]), and we now affirm.

### III

Defendant argues that Friday's testimony violated the best evidence rule and that without her testimony there was "a deficiency in [the People's] proof." The best evidence rule "requires the production of an original writing where its contents are in dispute and sought to be proven" (*Schozer v William Penn Life Ins. Co. of N.Y.*, 84 NY2d 639, 643 [1994]). The rule protects against fraud, perjury, and inaccurate recollection by allowing the jury to judge a document by its own literal terms.

According to defendant, the terms of Bloomberg's trust were in dispute because those terms would demonstrate definitively whether the trust funds belonged to Bloomberg. Under the best evidence rule, the trust instrument should have been admitted, and the People should not have been permitted to call Friday to testify.

The People respond that Friday's testimony did not violate the best evidence rule because she testified based on her independent knowledge that Bloomberg owned the money in the trust, and, regardless, the terms of the trust instrument were collateral to the issue of whether the funds belonged to Bloomberg. In the alternative, the People contend that even if admission of Friday's testimony violated the best evidence rule, the error was harmless.

██ ██ Defendant's best evidence rule challenge is of no moment because by the time defendant finally raised his objection, Bloomberg and several other prosecution witnesses had already provided the testimony that tended to prove ownership. Defendant allowed the People to admit this evidence without objection. Nevertheless, defendant asks us to review the introduction of Friday's testimony for its prejudicial effect, but, in light of the other testimony concerning ownership, we cannot say that Friday's testimony was so prejudicial as to deny defendant a fair trial. Moreover, based on the trial record, there is no significant probability that the jury would have failed to convict, even without Friday's testimony or admission of the trust document (*People v Crimmins*, 36 NY2d 230, 242 [1975]).

The People submitted proof of Bloomberg's ownership of the stolen funds through the direct testimony of Bloomberg himself, his campaign staffers, and an official of the Independence Party.

First, Bloomberg testified that $1.1 million of his personal funds were transferred to the Independence Party for the sole purpose of implementing the election-day ballot security operation. He further testified that defendant was the campaign's representative to the Party for the purposes of establishing the operation and that defendant failed to provide the services as promised and paid for. Even though he did not know the specifics of the funds transfer, Bloomberg never wavered from his testimony that his money went to pay for the fraudulent ballot security operation.

Second, Bloomberg's campaign staff and his wealth managers testified to the details of the actual transfer from the Michael R. Bloomberg Revocable Trust to the Independence Party. They provided firsthand knowledge that Bloomberg's money went to pay for the ballot security operation. The Independence Party's representative then described how the Independence Party paid defendant or SEO on invoices for ballot security expenditures.

Third, the People's financial investigator described the transfer of the money from the trust to the Independence Party to bank accounts belonging to SEO and defendant. The People introduced documentary proof of these transfers into evidence.

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges READ, SMITH, PIGOTT and ABDUS-SALAAM concur with Judge RIVERA; Judge GRAFFEO taking no part.

Order affirmed.