People v Christie (2024 NY Slip Op 00948)

People v Christie

2024 NY Slip Op 00948

Decided on February 22, 2024

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:February 22, 2024

113252
[*1]The People of the State of New York, Respondent,
v
Tahir Christie, Also Known as TY, Appellant.

Calendar Date:January 17, 2024

Before:Aarons, J.P., Pritzker, Lynch, Fisher and Mackey, JJ.

Law Offices of Jeffrey Lichtman, New York City (Jeffrey Einhorn of counsel), for appellant.
Robert M. Carney, District Attorney, Schenectady (Peter H. Willis of counsel), for respondent.

Fisher, J.
Appeal from a judgment of the County Court of Schenectady County (Mark J. Caruso, J.), rendered December 8, 2021, convicting defendant following a nonjury trial of the crimes of rape in the first degree, rape in the third degree and unlawful imprisonment in the second degree.
Defendant was charged by indictment with rape in the first degree, rape in the third degree and unlawful imprisonment in the second degree, stemming from allegations that defendant engaged in sexual intercourse by forcible compulsion with the victim in August 2020. Following a nonjury trial, defendant was convicted as charged. County Court sentenced defendant to a prison term of 14 years, to be followed by 20 years of postrelease supervision, for his conviction of rape in the first degree and to lesser concurrent terms on his remaining convictions. Defendant appeals.
We affirm. Defendant contends that the verdict is against the weight of the evidence. We disagree. When conducting a weight of the evidence review, this Court "must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Bateman, 212 AD3d 993, 994 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1140 [2023]). As relevant here, "[a] person is guilty of rape in the first degree when he or she engaged in sexual intercourse with another person . . . [b]y forcible compulsion" (Penal Law § 130.35 [1]), which means to compel by the "use of physical force" (Penal Law § 130.00 [8] [a]; see People v Machia, 206 AD3d 1272, 1273 [3d Dept 2022], lv denied 38 NY3d 1151 [2022]). "Proof of forcible compulsion also satisfies the lack of consent element included not just in first-degree rape but in every offense defined under Penal Law article 130" (People v Odu, 211 AD3d 1340, 1342 [3d Dept 2022] [internal quotation marks and citation omitted], citing Penal Law § 130.05 [2] [a]), including rape in the third degree (see Penal Law § 130.25 [3]). Furthermore, "[a] person is guilty of unlawful imprisonment in the second degree when he [or she] restrains another person" (Penal Law § 135.05). The term "[r]estrain" is defined to mean "to restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his [or her] liberty by . . . confining him [or her] . . . in the place where the restriction commences . . . without consent and with knowledge that the restriction is unlawful" (Penal Law § 135.00 [1]). In this context, "without consent" can be accomplished through "physical force" (id.).
The testimony adduced at trial revealed that defendant and the victim attended the same high school and had known each other for a year or two by the time of the incident. Defendant [*2]and the victim shared the same group of friends and had become close friends, whereby their relationship had become intimate. According to the victim, the last time they had been "slightly" intimate was the year before the incident, and at the time of the incident the victim had been dating defendant's cousin but remained close friends with defendant. As for the day of the incident, which occurred at night in a secluded area, the victim testified that she met defendant to discuss the victim's ailing relationship with her boyfriend, along with the victim and defendant's relationship. While they were lying down and talking in the folded-down back seats of defendant's vehicle, the victim testified that she attempted to sit up but that defendant got on top of her and would not get off her despite her request for him to do so. She testified that defendant then used his hand to hold her down, forced open her thighs which she had tried to tightly close, took off her shorts and began sexual intercourse with her. The victim testified that she kept yelling for defendant to stop and tried to punch and slap defendant, buck her hips and get away from him, but he was stronger than her and she was unable to do so. During this time, defendant said to the victim, "I love you," while he held the victim's hands down with such force that a ring that she was wearing caused an imprint on her finger. When defendant stopped, he drove the victim home where, according to her testimony, her "whole body hurt." After she was home, defendant sent several text messages to the victim apologizing, and they had a FaceTime conversation discussing the incident. The victim did not tell anyone about the incident until the following day, when she told a coworker and friend, showing him the text message conversation between her and defendant. Approximately six weeks after the incident, the victim reported the incident to her mother and the police.
The People also proffered the testimony of several friends, coworkers, the victim's mother and law enforcement, who generally corroborated the victim's account. Notably, a detective testified that he took screenshots of the text message conversation between defendant and the victim, including where defendant admitted that he "took advantage" of the victim and that he had "always been raised to seek for consent whenever it comes to stuff like this I'm sorry I've traumatized you." In a separate conversation between the victim's friend and defendant, the friend told defendant, "[b]ro you raped [the victim]" and that "I would not have guessed that you would do that," to which defendant responded, "I didn't think I would do that to her either. I'm sorry I betrayed everyone's trust."
For his part, defendant testified that he and the victim had a "friends with benefits" type of relationship, wherein they had been intimate at least 10 separate times since the summer before the incident. According to defendant, on the day of the incident, the victim [*3]asked him to find a place where there were no people around and, when they parked, they both went into the backseat of his vehicle to talk. Defendant testified that the victim had been cuddling with him when she started to kiss him, take off her clothing and initiated intercourse for 10 to 15 minutes before she asked defendant to stop. Defendant testified that he complied with the victim's first request by immediately stopping, and further that he did not hold down either her wrists or hands, he did not pry open her legs and that he did not use any physical force to have intercourse with her. He further testified that he was "shocked" when the victim reported the incident to the police and he considered it a false report. Relating to the text message conversations, defendant confirmed that he sent many of the messages presented at trial — including in response to the victim's friend who wrote to defendant that he "raped her" — but defendant did not remember whether he sent the message admitting he "took advantage" of the victim by not seeking consent, although he admitted it was possible that he sent it. Defendant further admitted that, after the victim had contacted the police, he performed Internet searches on his cell phone for the term of years in prison for rape.
Based on our review of the testimony and evidence presented at trial, a different verdict would not have been unreasonable given the differences between the victim's and defendant's versions of the incident (see People v Machia, 206 AD3d at 1276). However, these inconsistencies were explored on cross-examination and the victim's account was not contradicted by any compelling evidence (see People v Maisonette, 192 AD3d 1325, 1327 [3d Dept 2021], lv denied 37 NY3d 966 [2021]), and therefore "presented a classic he-said-she-said credibility determination for the [factfinder] to resolve" (People v Rivera, 206 AD3d 1356, 1358 [3d Dept 2022] [internal quotation marks and citations omitted], affd 39 NY3d 1062 [2023], cert denied ___ US ___, 143 S Ct 2675 [2023]). The evidence presented at trial — notably the text messages — further corroborated the victim's testimony that defendant did use physical force and had acted without her consent in engaging in sexual intercourse and by restraining her — particularly when considering defendant's muscular build against the victim's smaller stature (see People v Machia, 206 AD3d at 1276; see also People v Butkiewicz, 175 AD3d 792, 794-795 [3d Dept 2019], lv denied 34 NY3d 1076 [2019]). Accordingly, "deferring to the [factfinder's] credibility determination and viewing the evidence in a neutral light, we find that the convictions are not against the weight of the evidence" (People v Luna, 206 AD3d 1250, 1253 [3d Dept 2022] [internal quotation marks, brackets and citation omitted]; see People v Sharlow, 217 AD3d 1120, 1123 [3d Dept 2023], lv denied 40 NY3d 1013 [2023]; People v Machia, 206 AD3d at 1276).
Next, defendant contends that County Court erred [*4]in allowing the victim's friend to testify that the victim told him that she had been raped, as it did not fit the prompt outcry exception to hearsay.[FN1] Although hearsay is generally inadmissible, "evidence that a victim of sexual assault promptly complained about the incident is admissible to corroborate the allegation that an assault took place, with promptness being a relevant concept dependent on the facts" (People v Burdo, 210 AD3d 1306, 1310 [3d Dept 2022] [internal quotation marks and citation omitted], lv denied, 39 NY3d 1077 [2023]). Such prompt outcry is admissible "as long as it is made at the first suitable opportunity, but there is and can be no particular time specified" (People v Maisonette, 192 AD3d at 1327-1328 [internal quotation marks and citations omitted]). Here, although the friend testified that he believed the victim told him about the incident several weeks after it had occurred, he also testified that the victim told him in mid-August. Considering the balance of his testimony coupled with the victim's testimony that she told him the next day, which was the earliest opportunity given that the incident occurred late at night in mid-August and the friend was a coworker who the victim would not see until the next day, we are satisfied that such disclosure was admissible as a prompt outcry (see People v Shepherd, 83 AD3d 1298, 1300 [3d Dept 2011], lv denied 17 NY3d 809 [2011]; People v Perkins, 27 AD3d 890, 892-893 [3d Dept 2006], lv denied 6 NY3d 897 [2006]; see also People v Maisonette, 192 AD3d at 1328).
Lastly, we reject defendant's contentions that County Court should not have allowed the People to admit screenshots of text messages between defendant and the victim because such evidence lacked a proper foundation and violated the best evidence rule. As it relates to screenshots of text messages and similar digital photographs, "the proper foundation may be established through testimony that the photograph accurately represented the subject matter depicted" (People v Rodriguez, 38 NY3d 151, 155 [2022] [internal quotation marks, brackets and citations omitted]). Such foundation was properly laid by the People, inasmuch as the victim testified that she recognized the screenshots of the conversation between her and defendant, and that the screenshots were a fair and accurate depiction of the text conversation between her and defendant — a point corroborated by the detective, who testified that he took such screenshots (see People v Serrano, 173 AD3d 1484, 1488 [3d Dept 2019], lv denied 34 NY3d 937 [2019]; see also People v Byrd, 214 AD3d 1321, 1323 [4th Dept 2023], lv denied 40 NY3d 927 [2023]). Indeed, defendant also confirmed that the vast majority of text messages presented at trial were either sent or received by him, further testifying that — for the messages that he did not remember sending or receiving — that it was possible that he could have sent them. To that end, "[t]he best evidence rule requires the production of [*5]an original writing where its contents are in dispute and sought to be proven" (People v Haggerty, 23 NY3d 871, 876 [2014] [internal quotation marks and citation omitted]), and given that defendant challenges only the form of the messages but does not raise a genuine dispute as to their contents, the best evidence rule does not apply under these cirumstances (see People v Javier, 154 AD3d 445, 445-446 [1st Dept 2017], lv denied 30 NY3d 1106 [2018]). We have examined the parties' remaining contentions and have found them to be without merit or rendered academic.
Aarons, J.P., Pritzker, Lynch and Mackey, JJ., concur.
ORDERED that the judgment is affirmed.

Footnotes

Footnote 1: Defendant's contentions that the victim should not have been allowed to testify as to her prior disclosures of the incident to her friends and family were unpreserved, and therefore not before us (see CPL 470.05 [2]; People v Feliciano, 212 AD3d 474, 475 [1st Dept 2023], lv denied 40 NY3d 928 [2023]; People v Parrado, 200 AD3d 807, 808 [2d Dept 2021], lv denied 38 NY3d 953 [2022]).